**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 23-35** |
| | ) | |
| **GERALD  UNDERWOOD** | ) | |

**<u>Opinion and Order</u>**

      Defendant Gerald Underwood is charged in a Superseding Indictment with Possession of

a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1).  In the

late evening of November 9, 2022, City of Pittsburgh Police Officers Brandon Woods and Jelani

Williams, twice responded to reports of alleged criminal activity occurring at a Sunoco gas

station in Pittsburgh, Pennsylvania.  After the second report, which was a report of a shot fired,

law enforcement encountered Mr. Underwood, who was eventually arrested for unlawfully

possessing a firearm.   Presently before the Court are the following  pretrial motions filed by Mr.

Underwood:

- Motion to Suppress Evidence and Statements (ECF No. 39),
- Motion to Produce Evidence that the Government Intends to Use Under Federal
  Rules of Evidence 404(B) and 609 (ECF No. 40),
- Motion to Preserve Law Enforcement's Rough Notes (ECF No. 41),
- Motion to Dismiss Indictment (ECF No. 56), and
- Motion for Discovery (ECF No. 58).

The government has filed a Response to each of the Motions (ECF Nos. 60, 61, & 62).  In

relation to the Motion to Suppress Evidence and Statements, a hearing was held on November

21, 2024.  ECF No. 75.  At the hearing, the government presented the testimony of Pittsburgh

Police Officers Woods and Williams.

## I. Background

At approximately 11:13 p.m. on November 9, 2022, City of Pittsburgh Bureau of Police Officers Brandon Woods and Jelani Williams were dispatched to a Sunoco gas station located at the intersection of North Highland Avenue and East Liberty Boulevard in Pittsburgh, Pennsylvania.   The officers were responding to a report that four men were harassing customers. The person who reported the disturbance also stated that one of the men  said, "someone is gonna get robbed tonight."  Upon arrival the officers observed three men outside the store.   The officers reported that one of the men appeared to be homeless.  The officers spoke with the men and then, upon confirming that there was no disturbance, left the Sunoco, heading towards Penn Avenue.

At 11:34 p.m., Officers Woods and Williams were informed that shots were fired at the Sunoco they had just left.  At approximately the same time, both officers were also notified by the Real Time Crime Center that a ShotSpotter device had recorded a shot fired at the Sunoco. Gov. Ex. 1, Shot Spotter Report, Nov. 9, 2022.   The officers therefore returned to the Sunoco, cognizant of the prior report that a person had said that someone was going to be robbed tonight. Back at the Sunoco, the officers saw the same three men they had talked to earlier, as well as a fourth male not seen earlier.  The fourth male was later identified as Mr. Underwood.  The officers asked the men if anyone had heard a gunshot.  The men said that they had not.

Officers Woods and Williams, along with other law enforcement, began surveying the area, looking for a spent casing from a fired gunshot.  Mr. Underwood began to walk towards the officers.  He was wearing an unzipped brown construction Carhartt jacket and black pants. Officer Williams immediately identified that Mr. Underwood had a firearm on the inside of his Carhartt jacket.  As Mr. Underwood got close to Officer Williams, he zipped up his jacket.

Using his flashlight to gain Officer Woods' attention, Officer Williams mouthed to Officer

Woods, that Mr. Underwood has a firearm, and indicated with gestures that the two of them

should apprehend him.  The two officers grabbed Mr. Underwood and handcuffed him.  Officer

Williams unzipped Mr. Underwood's jacket and discovered a .40 caliber firearm.  Mr.

Underwood pleaded with the officers to not take the firearm out of the jacket, but they did

remove the firearm.

After Mr. Underwood was detained, he asked the officers not to take him to jail.  He

mentioned a person that he knew, which the officers viewed as attempt to gain a professional

courtesy to permit Mr. Underwood to be released from the situation.  Mr. Underwood continued

to plead with the officers, on his own initiative, for his release and for the officers' promise not

to say that the firearm they found was Mr. Underwoods.  Throughout the encounter, Mr.

Underwood continued to make spontaneous, unprompted statements to the officers, with the aim

of not being taken to jail and not being held responsible for the firearm.

Meanwhile, the officers continued to investigate a potential firearm crime.  Eventually,

Officer Woods found a spent .40 caliber casing consistent with the ShotSpotter report.  He also

found one .40 caliber live round in front of the Sunoco.  The officers also determined that Mr.

Underwood did not have a valid concealed carry permit.  Further, a review of Mr. Underwood's

prior criminal history record permitted the officers to conclude that he was a person not to

possess a firearm pursuant to 18 Pa. C. S. A. § 6105.  Although Mr. Underwood was making

spontaneous statements while the officers continued with their on-scene investigation, no officer

was questioning Mr. Underwood.  However, once it was determined that a crime had likely been

committed, Mr. Underwood was given his *Miranda* rights.  Mr. Underwood waived his *Miranda*

rights and made additional statements.  Mr. Underwood was then taken into custody, based upon

the officers' knowledge that probable cause to arrest existed that Mr. Underwood possessed a firearm in violation of the law.  He was then driven to the Allegheny County Jail.

## II.    Motion to Suppress Evidence

Mr. Underwood argues that all evidence must be suppressed, because the officers lacked probable cause, or reasonable suspicion, to stop him, to search him, and to arrest him.  He also argues that, even if the officers were justified in conducting a safety search for weapons, unzipping Mr. Underwood's jacket and reaching into an interior pocket exceeded the permissible scope of a *Terry* stop.  Mr. Underwood also argues that all statements he made must be suppressed as "fruit of the poisonous tree," as such were obtained as a result of the prior illegal search and seizure.  Finally, he argues that suppression of all statements is warranted, because such statements were made in violation of *Miranda* and of his rights under the Fifth and Sixth Amendments.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.  "In *Terry v. Ohio*, the Supreme Court held that a brief investigatory warrantless search, based on less than probable cause, is permissible under the Fourth Amendment where a police officer has a reasonable, articulable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968), *see also United States v. Yamba*, 506 F.3d 251, 255 (3d Cir. 2007).

### A.  Initial Stop, Detention, and Search of Mr. Underwood

Mr. Underwood argues that he was unconstitutionally arrested without probable cause when Officers Williams and Woods, each grabbed one of his arms, handcuffed him, and searched him.  Alternatively, he argues that law enforcement exceeded the scope of a *Terry* stop by reaching inside Mr. Underwood's jacket to pull out the firearm.

The totality of the objective facts known to Officers Wood and Williams at the time they detained Mr. Underwood and conducted a pat down search, support their reasonable belief that criminal activity might have been afoot and, specifically, that Mr. Underwood was armed and dangerous.  *United States v. Cortez*, 449 U.S. 411, 417 (1981) (reasonable suspicion is evaluated under "the totality of the circumstances—the whole picture—must be taken into account").  Testimony and evidence at the hearing showed that, when the officers encountered Mr. Underwood, they were investigating a report that a shot had been fired at the Sunoco.  Shortly before that report, the officers were at that Sunoco in response to a report of a group of persons harassing customers.  The officers were also told that one of the alleged harassers had stated that someone was going to be robbed tonight.  Thus, the officers were present at the Sunoco in response to reports of potential violent criminal activity.  When the officers encountered Mr. Underwood, Officer Williams observed that Mr. Underwood possessed a firearm within the interior of his jacket.  In light of the above facts known to the officers, they had an objectively reasonable suspicion to detain Mr. Underwood and to conduct a search of his person.  Observation of the firearm in Mr. Underwood's jacket, combined with the knowledge gained from the reports of criminal activity at the Sunoco, justified the officers' immediate detention of Mr. Underwood to ensure the safety of the officers and the public.  *Terry*, 392 U.S. at 27, (1968) ("issue is whether a reasonably prudent [officer] in the circumstances would be warranted in the

belief that his safety or that of others was in danger"). Reaching into Mr. Underwood's jacket to retrieve the firearm was therefore justified as in the intertest of safety. Accordingly, the Court finds no Fourth Amendment violation as to the detention and handcuffing of Mr. Underwood, or the search of his person.

### B.    Detention, Investigation, and Arrest

Once Mr. Underwood was detained, Mr. Underwood issued spontaneous statements tending to show his consciousness of guilt and that he was in fact in possession of the firearm. Nonetheless, the officers quickly conducted a criminal background search, specifically to determine whether Mr. Underwood was legally permitted to possess a firearm. This investigation included, checking if Mr. Underwood had a valid license to carry the firearm and reviewing of his criminal history to determine whether or not he was permitted to possess a firearm. The officers obtained the answers in short order. Mr. Underwood did not possess a permit and he was a person not permitted to possess a firearm. Such information established probable cause that a crime had been committed (unlawful possession of a firearm). Accordingly, the officers arrested Mr. Underwood. There was no Fourth Amendment violation from the officer's investigatory conduct or, from their subsequent arrest of Mr. Underwood.

### C.  Suppression of Statements

Mr. Underwood seeks to suppress the statements he made during the encounter, arguing that they were obtained during a custodial interrogation in violation of the Fifth and Sixth Amendments and of his rights as articulated in *Miranda v. Arizona*, 384 U.S. 438 (1966).[1] The Fifth Amendment to the United States Constitution provides that all criminal defendants have a

---

[1] Mr. Underwood's argument that suppression of all statements is warranted as "fruit of the poisonous tree," is moot. The Court has found that there was no Constitutional violation as to Mr. Underwood's stop, detention, search, and seizure of the firearm.

privilege against self-incrimination.  U.S. Const. Amend. V.  Pursuant to *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogations of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444.  A custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.*  The "procedural safeguards" referred to by the Supreme Court are the requirement that law enforcement inform a person of his *Miranda* rights.  *Id.*

Here, the sequence of events shows that, prior to his actual arrest, Mr. Underwood's freedom of movement was restricted to "the degree associated with a formal arrest," and thus *Miranda* warnings were required before law enforcement could begin questioning.  *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006).  The record demonstrates that law enforcement did not initiate questioning of Mr. Underwood before his formal arrest and/or before his waiver of his *Miranda* rights.  All statements uttered by Mr. Underwood prior to his formal arrest were spontaneous statements, and not responsive to any law enforcement questioning.  Such spontaneous statements were not obtained in violation of the Constitution or *Miranda*.  Once the officers learned that it was likely that a crime had occurred, they arrested Mr. Underwood and provided him with his *Miranda* rights.  Mr. Underwood clearly waived his *Miranda* rights; therefore, all statements obtained by law enforcement after said waiver are admissible.  The Court concludes that there was no violation of Mr. Underwood's rights pursuant to *Miranda* or the Constitution.

### D. Conclusion

Mr. Underwood was initially legally detained and searched, based upon reasonable suspicion that criminal activity was afoot at the Sunoco, because an officer had observed a firearm in Mr. Underwood's jacket. He was subsequently lawfully arrested, based upon probable cause that he unlawfully possessed a firearm. There was no *Miranda* violation or Constitutional violation. Therefore, all evidence obtained from Mr. Underwood's person and all statements he made were obtained lawfully. The defense motion to Suppress will be denied.

### III. Motion to Produce Evidence that the Government Intends to Use Under Federal Rules of Evidence 404(B) and 609 (ECF No. 40)

Federal Rule of Evidence 404(b) is titled "Other Crimes, Wrongs, or Acts," and specifies when such evidence is prohibited, when it is permitted, and directs the prosecution's obligations to notify the defense that it intends to introduce such evidence. As to "Prohibited Uses," Rule 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). With respect to "Permitted Uses," Rule 404(b)(2) provides that evidence of prior bad acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Finally, Rule 404(b)(3)'s notice requirements provide as follows:

> **(3)  Notice in a Criminal Case**. In a criminal case the prosecutor must:
>
> **(A)** provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;
>
> **(B)** articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and

> **(C)** do so in writing before trial – or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b)(3).  The United States Court of Appeals for the Third Circuit requires that Rule 404(b) evidence may only be introduced at trial if the government "can demonstrate its admissibility." *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017).  Admissibility of "evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose [that is, the evidence is proffered for a non-propensity purpose]; (2) be relevant [pursuant to Rule 402]; (3) satisfy Rule 403 [in that its probative value must not be substantially outweighed by its potential for causing unfair prejudice]; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." *United States v. Green*, 617 F.3d 233, 240 (3d Cir. 2010).

What constitutes "reasonable notice" of such material depends on "the circumstances and complexity of the prosecution." *United States v. Johnson*, 218 F. Supp. 3d 454, 462 (W.D. Pa. 2016).  In general, courts have found that, "reasonable notice" under Rule 404(b) is in the range of seven to ten days or one to two weeks prior to trial.  *United States v. Long-Parham*, 183 F. Supp. 3d 746, 750 (W.D. Pa. 2016); *United States v. Buckner*, 2020 U.S. Dist. LEXIS 5485, at *14–15 (M.D. Pa. Jan. 13, 2020).  There is also precedent for ordering disclosure of such evidence thirty days in advance of trial, when the circumstances and complexity of the case require such earlier disclosure.  *United States v. Coles*, 511 F. Supp. 3d 566, 593 (M.D. Pa. 2021)[2].  Thus, to determine when disclosure should occur depends on "the circumstances and complexity of the prosecution." *Johnson*, 218 F. Supp. 3d at 462).

---

[2] In *Coles*, the District Court concluded: "Given the circumstances and complexity of this prosecution, and the anticipated volume of motions in limine, we will adopt [defendant's] proposal and order the government to notify all defendants whether it intends to offer evidence under Rule 404(b) or Rule 609(b) at least 30 days before trial. *United States v. Coles*, 511 F. Supp. 3d 566, 593 (M.D. Pa. 2021)."

Mr. Underwood seeks disclosure of prior bad act evidence that the government intends to use at trial, sixty days before trial. Here, the government has not yet identified the prior bad acts it might want to present at trial. The government also suggests a disclosure date, approximately twenty-one days prior to trial. In light of the relatively non-complex nature of the present case, three weeks appears to be sufficiently in advance of trial for the defense to make effective use of the material, and to request an evidentiary hearing prior to trial if necessary. Accordingly, Mr. Underwood's Motion to Produce Evidence that the Government Intends to Use Under Federal Rules of Evidence 404(B) and 609 (ECF No. 40) will be granted, to the extent that the government must disclose such material twenty-one days prior to trial, otherwise the Motion will be denied.

## IV.     Motion to Preserve Law Enforcement's Rough Notes (ECF No. 41)

Mr. Underwood requests that the Court order all involved law enforcement who participated in the investigation and arrest of Mr. Underwood, retain and preserve their rough notes. The government states that it is aware of its responsibility to provide rough notes material; and therefore, argues that the Motion should be denied as moot. Nonetheless, pursuant to *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994), *United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983), and *United States v. Vella*, 562 F.2d 275 (1977), the Motion will granted. The government will be ordered to preserve rough notes consistent with its obligations under *Vella* and *Ammar*.

## V.      Motion for Discovery (ECF No. 58)

Mr. Underwood seeks to compel the disclosure of Rule 16 material, specifically as related to the observation of Mr. Underwood with a firearm and any observation by law enforcement that purports to have seen Mr. Underwood discharge the firearm. The government notes that it has turned over the relevant evidence to defense counsel and has informed defense

10

counsel that no such sought-after video exists.  The government also states its intention to
continue to abide by its discovery obligations.

"Rule 16 of the Federal Rules of Criminal Procedure delineates the categories of
information to which defendants are entitled in pretrial discovery in criminal cases, with some
additional material being discoverable in accordance with statutory pronouncements and the due
process clause of the Constitution." *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994).
Federal Rule of Criminal Procedure 16(a)(1) requires the government, when requested by
defendant, to disclose, within proscribed limits, the defendant's oral, written, or recorded
statement (Rule 16(a)(1)(A) & (B)) and the defendant's prior record (Rule 16(a)(1)(D)).  In
addition, pursuant to Rule 16(a)(1)(E) ("Documents and Objects"), upon the defendant's request,
"the government must permit a defendant to inspect and to copy or photograph" said documents
and objects as set forth in the Rule.  Fed. R. Crim. P. 16(a)(1)(E).  Similarly, when requested by
defendant, the government must also permit the inspection, copying, or photographing of results
or reports of any physical or mental examinations and scientific tests or experiments.  Fed. R.
Crim. P. 16(a)(1)(F).  Finally, when requested, "the government must give to the defendant a
written summary of any [expert] testimony that the government intends to use, . . .  during its
case-in-chief at trial," and the written summary "must describe the witness's opinions, the bases
and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G).
In addition, the government remains under a continuing duty to disclose any additional evidence
it discovers.  Fed. R. Crim. P. 16(c).  "Information Not Subject to Disclosure," is described in
Rule 16(a)(2), as follows:

> Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not
> authorize the discovery or inspection of reports, memoranda, or other internal
> government documents made by an attorney for the government or other
> government agent in connection with investigating or prosecuting the case.

Fed. R. Crim. P. 16(a)(2).[3]

In light of the government's responses to defendant's requests, which indicate that the government is complying with its discovery obligations, the Motion for Discovery will be denied, without prejudice.

## VI.    Motion to Dismiss Indictment (ECF No. 56)

Mr. Underwood argues that § 922(g)(1) is an unconstitutional regulation of the right to possess firearms and ammunition in violation of the Second Amendment to the United States Constitution.  As stated, Mr. Underwood is charged with one count of possessing a firearm and ammunition, while knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).[4]  Section 922(g)(1) of Title 18 provides that "[i]t shall be unlawful for any person-(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; . . . ."  18 U.S.C. § 922(g)(1).

### A.    Background

The Superseding Indictment alleges that Mr. Underwood has three prior qualifying state convictions, occurring in the Court of Common Pleas of Allegheny County, Pennsylvania, and two prior qualifying federal felony convictions, occurring in the Western District of Pennsylvania, that bar him from possessing a firearm and ammunition under § 922(g)(1).

---

[3]  Rule 16(a)(2) also prohibits "the discovery or inspection of statements made by prospective government witnesses except as provided in [the Jencks Act] 18 U.S.C. § 3500."  Fed. R. Crim. P. 16(a)(2).

[4] For purposes of the Motion to Dismiss, the Court accepts as true the allegations of the Indictment.  *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (abrogated on other grounds by *Rehaif v. United States*, 588 U.S. 225 (2019)).

At criminal number CP9903829, Mr. Underwood was convicted, in the Court of Common Pleas of Allegheny County of Robbery of a Motor Vehicle and Criminal Conspiracy, on or about June 12, 2000.  At criminal number CP199913466, Mr. Underwood was convicted, in the Court of Common Pleas of Allegheny County of Delivery of a Controlled Substance and Possession with Intent to Deliver, on or about June 12, 2000.  At criminal number CP201301492, Mr. Underwood was convicted, in the Court of Common Pleas of Allegheny County of Possession with Intent to Deliver Marijuana, on or about February 16, 2014.  In the Western District of Pennsylvania, Mr. Underwood was twice convicted of Felon in Possession, first on July 31, 2008 (2:08-cr-92) and next, on February 22, 2022 (2:17-cr-324).  The facts supporting the present § 922(g)(1) charge arose from, as identified above, law enforcement investigating a report of shots fired, and potentially a robbery, at the Sunoco gas station.  One of the investigating officers observed a firearm within Mr. Underwood's jacket, which led to his detention and eventual arrest.  In addition, law enforcement recovered a spent casing and a live round on the ground of the Sunoco parking lot.  Both the spent casing and the love round were .40 caliber ammunition consistent with the firearm found upon Mr. Underwood.

> **B.    Arguments**

Mr. Underwood argues that § 922(g)(1) is unconstitutional as applied to him.  He also argues that § 922(g)(1) is unconstitutional on its face.  Next, he argues that 922(g)(1) is unconstitutionally vague.  Finally, Mr. Underwood argues that § 922(g)(1) is an unconstitutional violation of the Constitution's Commerce Clause.  Mr. Underwood acknowledges that his Commerce Clause argument is foreclosed by precedent, but he asserts it for preservation purposes.

Mr. Underwood primarily supports his arguments by relying on the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and the now-vacated Third Circuit's *en banc* decision in *Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024) (*en banc*).  While the government's petition for certiorari from the *Range* decision was pending before the Supreme Court, that Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), after which the Supreme Court vacated the *en banc* decision in *Range* and remanded for further consideration.  Since the filing of the present Motion, the Third Circuit issued a new *en banc* decision in *Range*, reaching the same conclusions as the Court did in its prior opinion.  *Range v. Att'y Gen. United States*, 124 F.4th 218 (3d Cir. 2024).

In opposition to Mr. Underwood's "as applied" challenge, the government presents several independent arguments.  First, the government argues that Mr. Underwood has failed to demonstrate that he possessed the firearm for self-defense, which is the only legitimate Second Amendment purpose recognized by the Supreme Court.  Second, the government argues that Defendant was legitimately disqualified from possessing firearms under the conditions of his federal supervised release term that he was serving at the time he possessed the firearm. Third, the government argues that Mr. Underwood's prior criminal history places him in a category where the Constitution permits barring him from possessing firearms and ammunition under § 922(g)(1).  Finally, the government argues that, its historical analysis of governmental restrictions on possessing firearms, demonstrates that § 922(g)(1) is consistent with historical restrictions on possession of firearms and ammunition by people who have prior qualifying firearm convictions.  Finally, as to Mr. Underwood's facial challenge, the government argues

that the challenge fails because he cannot show that § 922(g)(1) is unconstitutional in all circumstances.

###    C.    Second Amendment Case Law

The Second Amendment of the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed."  The *Bruen* decision follows the Supreme Court's prior landmark Second Amendment decisions of *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010).  In *Heller* and *McDonald*, the Supreme Court "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."  *Bruen*, 142 S. Ct. at 2122.  In *Bruen*, the Supreme Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."  *Bruen*, 142 Sup. Ct. at 2122.  The *Bruen* Court held that, New York City's requirement that a citizen show "proper cause" to carry a handgun in public, violates the Constitution, because it "prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."  *Id.* at 2156.

Relevant to the instant Motion to Dismiss, the *Bruen* Court held that the standard for a Second Amendment analysis is as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects the conduct."  *Id.* at 2129-30.  If a Court determines that the conduct being regulated is presumptively protected by the Second Amendment, then to justify the regulation, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id.* at 2127.  "Only if a firearm regulation is consistent with this Nation's

historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's protection." *Id.* at 2126.

In *Range II*, a declaratory judgment proceeding, the *en banc* Third Circuit Court addressed the constitutionality of 18 U.S.C. § 922(g)(1), as applied to the plaintiff, Bryan Range. Section 922(g)(1) barred Mr. Range from possessing firearms, because he had previously "pleaded guilty in the Court of Common Pleas of Lancaster County to one count of making a false statement to obtain food stamps in violation of Pennsylvania law." *Range*, 124 F.4th at 222-23 (*citing* 62 Pa. Stat. Ann. § 481(a)). Range sought "a declaration that § 922(g)(1) violates the Second Amendment as applied to him" and an "injunction prohibiting the law's enforcement against him." *Id.* at 223. "Range assert[ed] that but for § 922(g)(1), he would 'for sure' purchase another deer-hunting rifle and 'maybe a shotgun' for self-defense at home." *Id.*

The *Range* Court applied *Bruen* to determine whether § 922(g)(1) was constitutional as applied to Bryan Range. First, the Court concluded that "*Heller* and its progeny lead us to conclude that Bryan Range remains among 'the people'[protected by the Second Amendment] despite his 1995 false statement conviction." *Id.* at 228. Next, the *Range* Court found that "'the Constitution presumptively protects" Bryan Range's proposed conduct, "to possess a rifle to hunt and a shotgun to defend himself at home." *Id*. Therefore, the burden shifted to the government to show that "§ 922(g)(1), as applied to [Mr. Range], 'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Id.* (quoting *Bruen*, 597 U.S. at 19). After reviewing the government's historical evidence and arguments, the *Range* Court concluded that "that the Government has not shown that the principles underlying the Nation's historical tradition of firearms regulation support depriving Range of his Second Amendment right to possess a firearm." *Id.* at 232 (citing *Rahimi*, 144 S.Ct. at 1898 and *Bruen*, 597 U.S. at

17).  The *Range* Court succinctly summarized its holding, stating that, "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights."  *Id.*  The Court described its decision as "narrow," addressing the constitutionality of § 922(g)(1) only as applied to Bryan Range.  *Id.*

###   D.    Discussion

####     1.    As Applied Challenge

An as applied challenge contends that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right."  *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citation omitted).  In light of the *Range* decision, it is clear that Mr. Underwood is one of the "people" protected by the Second Amendment despite having a prior qualifying conviction.  Next, the Court determines whether "the Second Amendment's plain text covers an individual's conduct."  *Bruen*, 597 U.S. at 24.  If the plain text does not cover the person's conduct, then the regulation at issue does not violate the Second Amendment.  However, if the plain text does cover such conduct, then "the Constitution presumptively protects the conduct" and the burden shifts to the government to justify the constitutionality of the firearm regulation.  *Id.*

#####       a.   Defendant's Conduct is Not Protected

Mr. Underwood contends that he desires to possess firearms and ammunition as protected by the Second Amendment's guarantee of the right of the people to keep and bear arms.  However, this actual conduct is the focus for analysis, and his conduct at issue is not protected under the plain text of the Second Amendment.  Here, Mr. Underwood was arrested for possessing a firearm and ammunition.  Mr. Underwood's possession of the firearm was in

connection with a report of shots fired in a public place; namely, a Sunoco gas station. Moreover, once it was apparent to Mr. Underwood that law enforcement had identified his concealed firearm, Mr. Underwood sought to persuade the officers to say that the firearm was not his and to let him go, even though the officers were just beginning their investigation. Such conduct is a blatant attempt to prevent law enforcement from performing its duties, specifically, in ensuring that persons not permitted to possess firearms, do not in act have such firearms on their person. lawfully regulating the sale of firearms. Mr. Underwood's conduct of unlawfully possessing a firearm and ammunition, when he knew he was prohibited from possessing firearms and ammunition based on his prior offense, and his conduct in trying to persuade law enforcement to allow him to continue to violate the law, establishes Mr. Underwood as a person who is dangerous to the safety of the public and is disruptive to the orderly functioning of society. Under these circumstances, the Second Amendment's plain text does not protect the Mr. Underwood's conduct. *Bruen*, 597 U.S. at 24. Therefore, Mr. Underwood's conduct is not presumptively protected by the Constitution. No further analysis is necessary. The government has no further burden to justify the § 922(g)(1) firearm regulation as applied to Mr. Underwood. Accordingly, because Mr. Underwood's conduct was not protected by the plain text of the Second Amendment, his as applied challenge fails.

> **b. Mr. Underwood's Conduct is also Not Protected Because he was Under a Sentence of Supervised Release Prohibiting him from Possessing Firearms**

At Criminal Number 17-324 in the Western District of Pennsylvania, Mr. Underwood was sentenced to a term of imprisonment of 73 months, to be followed by a term of supervised release of two years. Am. Judgment, ECF No. 94. His term of supervision began on March 11,

2022, which means he was under a term of supervision on his sentence at this criminal case at the time of the events at issue, November 9, 2022.  *See* ECF Nos. 99, 111.

The Third Circuit recently held that "[a] convict completing his sentence on supervised release does not have a Second Amendment right to possess a firearm."  *United States v. Moore*, 111 F.4th 266, 273 (3d Cir. 2024).  "The Third Circuit observed that, under early American forfeiture laws, 'a convict may be disarmed while he completes his sentence and reintegrates into society.'"  *United States v. Gaines*, No. 2:24-CR-87, 2024 WL 4435065, at *2 (W.D. Pa. Oct. 7, 2024) (quoting Moore, 111 F.4th at 272).  Therefore, Mr. Underwood's "as-applied challenge to Section 922(g)(1) fails under *Moore*, because he was on supervised release at the time the conduct underlying his Section 922(g)(1) charge occurred."  *Gaines*, No. 2:24-CR-87, 2024 WL 4435065, at *2.

### c.  Even if Mr. Underwood's Conduct was Protected, the Government Demonstrates Sufficient Historical Analogues

Even if Mr. Underwood's conduct were protected by the Second Amendment, his as applied challenge still fails, because as applied to him, § 922(g)(1) corresponds with "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen,* 597 U.S. at 19.  As explained in *Bruen*, the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.* at 30 (emphasis in original).  "'To be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue."  *Range*, 124 F.4th at 228 (citing *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29)). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Bruen,* 597 U.S. at 30.  In determining whether historical and modern firearms regulations are

similar enough, the Court inquires into "how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *Bruen*, 597 U.S. at 29.

With such guidelines in mind, the Court concludes that the government has presented sufficiently similar historical analogues to § 922(g)(1).  The relevant historical analogous firearm regulations, cited by the government, disarmed persons deemed to be dangerous, not trusted to obey the law, or who were disruptive, or a threat, to society.  The purpose of such historical firearm regulations was to ensure the orderly functioning of society and to protect the public.

The regulated conduct, purposes, and objectives of the historical firearm analogues, when compared to the regulated conduct, purposes, and objectives of § 922(g)(1), as applied to Mr. Underwood, clearly reflect requisite similarity to establish § 922(g)(1)'s constitutional compliance with the Second Amendment.  Defendant's relevant qualifying convictions - Robbery, Delivery of a Controlled Substance, Possession with Intent to Deliver, and Possession of a Firearm by a Convicted Felon - also demonstrate that he is a threat to public safety and to the orderly functioning of society.  Mr. Underwood was also serving a sentence of  supervised release that separately prohibited him from possessing a firearm.  Further, Mr. Underwood's present offense conduct, of unlawfully possessing a firearm and ammunition, sufficiently places him in the category of persons who were historically properly disarmed to ensure the orderly functioning of society and to protect the public.  Section 922(g)(1), as applied to Mr. Underwood, "is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  As such, § 922(g)(1) is constitutional as applied to Defendant.  Defendant's "as applied" challenge to § 922(g)(1) fails.

### 2.  Facial Challenge

Mr. Underwood next argues that § 922(g)(1) is unconstitutional on its face.  "A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case."  *Marcavage*, 609 F.3d at 273 (citation omitted).  "A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.'"  *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (*en banc*) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

The government argues that the facial challenge fails, because the Defendant is unable to show that § 922(g)(1) is unconstitutional in *all* circumstances.  The Court agrees.  Initially, the above decision, finding that § 922(g)(1) is constitutional as applied to this Defendant, establishes that § 922(g)(1) is not unconstitutional in all cases. While Defendant relies upon the *Range* Court's finding, that § 922(g)(1) was unconstitutional as applied to Bryan Range, such holding was expressly narrow and limited to Bryan Range's prior fraud conviction and his proposed prospective protected firearm conduct.  The *Range* Court did not find or even suggest that § 922(g)(1) is unconstitutional in all cases.  Accordingly, Defendant's facial challenge to § 922(g)(1) fails.

### 3.  Vagueness

Defendant's vagueness challenge also fails.  "A statute is void on vagueness grounds if it (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'"  *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (quoting *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir.2008)).  The statute is clear in delineating the conduct that bars a person from possessing a firearm or ammunition in violation of § 922(g)(1).

A person who has been convicted of a crime is able to understand whether the conviction for such crime is punishable by imprisonment for more than one year; and therefore, knows that such conviction makes it a crime for him to possess a firearm or ammunition in violation of § 922(g)(1).  Criminal statutes clearly define crimes and prescribe corresponding penalties. Information that a prior conviction carries a potential punishment of imprisonment for more than one year, is readily available.  Where the penalty for a crime of conviction includes punishment for a term of imprisonment of more than one year, then § 922(g)(1) bars that person from possession of a firearm or ammunition.  Moreover, § 922(g)(1) requires the government to prove that the defendant actually *knew* that he had been convicted of a crime punishable by imprisonment for a term exceeding one year.  Such a *mens rea* element, "makes it less likely that a defendant will be convicted for an action that he or she committed by mistake." *Fullmer*, 584 F.3d at 152 (citing *Gonzales v. Carhart*, 550 U.S. 124, 149, 127 Sects. 1610, 167 L.Ed.2d 480 (2007)). Thus, the Defendant's vagueness challenge to § 922(g)(1) fails.

### 4.  Commerce Clause

Finally, Defendant's argument that § 922(g)(1) is an unconstitutional violation of the Constitution's Commerce Clause is denied, as the argument is foreclosed by binding precedent. *See United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001).

### E.  Conclusion

For the reasons explained above, Mr. Underwood's Motion to Dismiss Indictment (ECF No. 56) will be denied.

## ORDER

AND NOW, this 6th day of February 2025, for the reasons explained above, Gerald Underwood's Motions are resolved as follows:

1. The Motion to Suppress Evidence and Statements (ECF No. 39) is DENIED.

2. The Motion to Produce Evidence that the Government Intends to Use Under Federal Rules of Evidence 404(B) and 609 (ECF No. 40) is GRANTED insofar as the government shall disclose such material twenty-one days prior to trial. The Motion is otherwise DENIED.

3. The Motion to Preserve Law Enforcement's Rough Notes (ECF No. 41) is GRANTED in that the government shall preserve rough notes consistent with its obligations under *Vella* and *Ammar*.

4. The Motion for Discovery (ECF No. 58) is DENIED without prejudice.

5. The Motion to Dismiss Indictment (ECF No. 56) is DENIED.

Marilyn J. Horan
United States District Court Judge