IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Civil No. 23-35 |
| | ) | |
| GERALD UNDERWOOD | ) | |

## Memorandum Opinion and Orders

Defendant Gerald Underwood is charged in a Superseding Indictment with Possession of a Firearm and Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1). In the late evening of November 9, 2022, City of Pittsburgh Police Officers, Brandon Woods and Jelani Williams, twice responded to reports of alleged criminal activity occurring at a Sunoco gas station in Pittsburgh, Pennsylvania. After the second report, which was a report of a shot fired as reported by the Real Time Crime Center (RTCC), law enforcement encountered Mr. Underwood, who was eventually arrested for unlawfully possessing a firearm. Presently before the Court are pretrial motions filed by the government and by Mr. Underwood, who is representing himself, in advance of a jury trial scheduled for June 9, 2025.

**I. Relevant Background**

As presented during the suppression hearing in this case, the following facts are relevant to the present Motions. At approximately 11:13 p.m. on November 9, 2022, City of Pittsburgh Bureau of Police Officers, Brandon Woods and Jelani Williams, were dispatched to a Sunoco gas station, located at the intersection of North Highland Avenue and East Liberty Boulevard in Pittsburgh, Pennsylvania. The officers were responding to a report that four men were harassing customers. The person who reported the disturbance also stated that one of the men said, "someone is gonna get robbed tonight." Upon arrival the officers observed three men outside the

store. The officers spoke with the men, and, upon confirming that there was no disturbance, the officers left the Sunoco, heading towards Penn Avenue.

Approximately twenty-one minutes later, at 11:34 p.m., Officers Woods and Williams were informed that shots were fired at that Sunoco. At approximately the same time, both officers were notified by the Real Time Crime Center that a ShotSpotter device had recorded a shot fired at that Sunoco. Gov. Ex. 1, Shot Spotter Report, Nov. 9, 2022. The officers therefore returned to the Sunoco, where they observed the same three men they had talked to earlier, as well as a fourth male not seen earlier. The fourth male was later identified as Mr. Underwood. The officers asked the men if anyone had heard a gunshot. The men said that they had not.

Officers Woods and Williams, along with other law enforcement, began surveying the area, looking for a spent casing from a fired gunshot. Mr. Underwood began to walk towards the officers. He was wearing an unzipped brown construction Carhartt jacket and black pants. Officer Williams immediately identified that Mr. Underwood had a firearm on the inside of his Carhartt jacket. As Mr. Underwood got close to Officer Williams, Mr. Underwood zipped up his jacket. Using his flashlight to gain Officer Woods' attention, Officer Williams mouthed to Officer Woods, that Mr. Underwood had a firearm, and indicated with gestures that the two of them should apprehend him. The two officers grabbed Mr. Underwood and handcuffed him. Officer Williams unzipped Mr. Underwood's jacket and discovered a .40 caliber firearm. Mr. Underwood pleaded with the officers to not take the firearm out of the jacket, but they did remove the firearm.

After Mr. Underwood was detained, he asked the officers not to take him to jail. He mentioned a person that he knew, which the officers viewed as attempt to gain a professional courtesy, to permit Mr. Underwood to be released from the situation. Mr. Underwood continued

2

to plead with the officers, on his own initiative, for his release and for the officers' promise not to say that the firearm they found was Mr. Underwoods. Throughout the encounter, Mr. Underwood continued to make spontaneous, unprompted statements to the officers, with the aim of not being taken to jail and not being held responsible for the firearm.

Meanwhile, the officers continued to investigate a potential firearm crime. Eventually, Officer Woods found a spent .40 caliber casing consistent with the ShotSpotter report. He also found one .40 caliber live round in front of the Sunoco. The officers also determined that Mr. Underwood did not have a valid concealed carry permit. A review of Mr. Underwood's prior criminal history record permitted the officers to also conclude that he was a person not to possess a firearm pursuant to 18 Pa. C. S. A. § 6105. Although Mr. Underwood was making spontaneous statements while the officers continued with their on-scene investigation, no officer was questioning Mr. Underwood. However, once it was determined that a crime had likely been committed, Mr. Underwood was given his *Miranda* rights. Mr. Underwood waived his *Miranda* rights and made additional statements. Mr. Underwood was then taken into custody, based upon the officers' knowledge and conclusion that probable cause to arrest existed that Mr. Underwood possessed a firearm in violation of the law.

## II.     Defense Motions

The Court will address each of the issues argued by Mr. Underwood. Mr. Underwood argued some same issues in more than one of his Motions.[1]

---

[1] Mr. Underwood filed seven Motions to Dismiss or Motions in Limine. *See* Document Nos. 87, 89, 95, 102, 106, 116, and 118.

### A. Motions Addressing the RTCC Video Footage of the Incident[2]

Mr. Underwood has endeavored to obtain a copy of RTCC video footage taken on the scene at the Sunoco, during the November 9, 2022 ShotSpotter notification. It is Mr. Underwood's position that this video footage is exculpatory and will show that he is innocent. He further argues that the failure of the prosecution to turn over the RTCC footage, or to preserve the footage, amounts to a due process violation, as well as a violation under *Brady v. Maryland*, 373 U.S. 83 (1963). Mr. Underwood acknowledges the government's position that the video footage was erroneously not preserved, but he asserts that the footage likely exists, based upon other discovery materials that indicate that the footage was marked for preservation by the RTCC. As a remedy, Mr. Underwood seeks dismissal of the indictment, or perhaps, the issuance of an adverse inference against the government regarding the footage.

Mr. Underwood has raised the issue of the missing RTCC video footage before. On June 4, 2024, in response to defense pretrial discovery motions, the government explained as follows:

> The Real Time Crime Center video was not retained and therefore does not exist, so there is no video to turn over. This has been communicated in court on the record at least once, it has been communicated to the defendant's previous attorney, and it was communicated directly from the undersigned AUSA to the defendant in the presence of his attorney when he and his attorney asked for an explanation as to why there was no video.

Gov. Resp. at 5 (ECF No. 60). Nothing has changed since that time to indicate that the video footage was actually preserved, or that it continues to exist, or that it has been kept from Mr. Underwood. Thus, with no video footage to turn over, the request for the Court to order the government to produce the footage is denied.

---

[2] Arguments and discussion about the RTCC video footage appear in Mr. Underwood's Motions filed at Document Nos. 87, 95, 102, and 106.

With respect to Mr. Underwood's assertion, that the missing video footage is exculpatory, the government disagrees, and indicates that, if necessary and appropriate, it intends to introduce RTCC documentary evidence, as well as evidence of a conversation between the RTCC officer (who was not present at Sunoco, but who did view the video footage) and one of the officers, who was on scene at the Sunoco, wherein they discussed what the RTCC officer had seen on the video. Both the defense and the government may present their respective arguments to the jury as to the video, if the issue is properly before the jury. In particular, Mr. Underwood may cross-examine the officers as to whether the missing footage is exculpatory. At this juncture, the evidence is not sufficient for the Court to issue an adverse inference instruction to the jury regarding the video footage.

Mr. Underwood has also filed a motion to dismiss the indictment, based upon the failure of the government to present the RTCC video footage to the Grand Jury, again arguing that the video would have exonerated him. However, the government states that the evidence provided to the Grand Jury included sufficient evidence of Mr. Underwood's illegal firearm and ammunition possession to sustain the issuance of the indictment, without the RTCC video footage. Defendant's Motion for dismissal is denied.

Finally, Mr. Underwood appears to argue that the Superseding Indictment must be dismissed, because the prosecution failed to preserve potentially exculpatory evidence; that is, it failed to preserve the RTCC video footage. Mr. Underwood argues that the failure to preserve the footage violated his due process rights. He maintains that there is no other conclusion than that the video footage is exculpatory. He partly reasons that, if the footage were inculpatory, there is little chance that experienced and trained officers would have failed to preserve such footage. The implication being that the officers knew it was exculpatory and purposely did not

retain it. Mr. Underwood thus argues that had the RTCC video footage been preserved, it would have demonstrated to the jury that it was not Mr. Underwood who fired the shot.

Due process requires that the prosecution disclose exculpatory evidence within its possession. *Brady*, 373 U.S. at 87. Where the government fails to preserve potentially exculpatory evidence, the right to due process is violated only if the evidence possesses "an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that a defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). The Supreme Court has stated that the failure to preserve potentially exculpatory evidence implicates due process concerns only when the police acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). "To establish a due process violation based on law enforcement's failure to preserve potentially exculpatory evidence, a defendant must show: that the potentially exculpatory nature of the evidence was apparent at the time of destruction or loss[3]; the lack of 'comparable evidence by other reasonably available means'[4]; and that the government acted in 'bad faith.'"[5] *United States v. Henry*, 842 F. App'x 809, 814 (3d Cir. 2021).

In this case, the Real Time Crime Center marked the video footage for preservation. The marking of the footage for preservation started a time period within which the Pittsburgh Police were required to download the footage, or it would be removed from the Real Time Crime Center system. The police did not download the footage within the applicable time frame; and thus, it was systemically removed and is no longer available.

---

[3] Citing *California v. Trombetta*, 467 U.S. 479, 489 (1984).
[4] Quoting *Trombetta*, 467 U.S. at 489.
[5] Quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

There is no evidence that law enforcement deliberately chose not to download the video footage based upon an awareness of its potential evidentiary, and exculpatory, value. Instead, it seems that it was simply an error that no one from the Pittsburgh Police timely downloaded the footage. Moreover, it is clear from the evidence already disclosed that it is highly unlikely that the Pittsburgh Police officers in charge of downloading the footage, or any other involved law enforcement officer, believed that the footage was exculpatory to Mr. Underwood. To the contrary, the officers knew the sequence of events that led to Mr. Underwood's arrest; and, given the evidence they were aware of, including all of Mr. Underwood's own statements and his actual possession of the gun and ammunition, they would not have thought that the video footage would exonerate him as to the firearms charge at issue. In any event, none of the police officers' actions indicate any bad faith on the part of the government. At worst, the failure to preserve the video footage was "negligent." *Youngblood*, 488 U.S. at 58. Because there is no showing of bad faith, Mr. Underwood cannot demonstrate that his due process rights were violated by the failure to preserve the RTCC video footage of events that preceded the police encounter with Mr. Underwood, while he possessed a firearm and ammunition. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("unless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). The Court finds that Mr. Underwood has not established that the failure to preserve the video footage violated his due process rights. Therefore, the Court will again deny Mr. Underwood's Motion for Dismissal of the Indictment relative to his argument that the prosecution failed to preserve the video footage.

### B. Video Footage from Sunoco and Nearby Schools[6]

Next, Mr. Underwood requests production of the video from the Sunoco, taken on November 9, 2022, as well as both indoor and outdoor video footage taken from schools located near the Sunoco. In response, the government states that it does not possess any video footage from the Sunoco or from any nearby school. Thus, the request for such video footage is denied.

### C. Request for Rough Notes[7]

Mr. Underwood requests law enforcement's rough notes. His prior counsel made the request previously. The government indicated then, and now repeats the same, that the officer's in this case did not have rough notes. Thus, the request for rough notes is denied as moot.

### D. Request for Grand Jury Transcripts and Grand Jury Issues[8]

Mr. Underwood requests production of the Grand Jury transcripts. "As a matter of public policy, grand jury proceedings generally must remain secret except where there is a compelling necessity." *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989). A defendant may be entitled to review grand jury testimony after a witness "testified on direct examination at trial if their grand jury testimony was related to the subject matter of their trial testimony." *United States v. Jackson*, 363 F. App'x 159, 161 (3d Cir. 2010) (citing 18 U.S.C. § 3500(e); *United States v. Wong*, 78 F.3d 73, 83 (2d Cir. 1996); and *United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir. 1972)). In addition, Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) provides that "[t]he court may authorize disclosure - at a time, in a manner, and subject to any other condition that it directs - of a grand jury matter: (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed.

---

[6] Arguments and discussion about Sunoco video footage and nearby school video footage appear in Mr. Underwood's Motions filed at Document Nos. 87, 95 and 102
[7] The request for rough notes appears in Document No. 95.
[8] The Grand Jury issues appear in Document Nos. 95 and 106.

R. Crim. Proc. 6(e)(3)(E)(ii). Finally, [t]o support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy." *McDowell*, 888 F.2d at 289 (citing *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1957)).

Mr. Underwood has not provided a basis upon which the Court would order disclosure of the Grand Jury transcripts. However, the government, in its filing dated May 20, 2025, states that it intends to provide Grand Jury transcripts to Mr. Underwood. ECF No. 115, at 2. The present motion for production of Grand Jury transcripts is denied as moot.

### E. Motions to Dismiss Indictment[9]

Mr. Underwood argues that the charge, 18 U.S.C. § 922(g)(1), is an unconstitutional violation of the Second Amendment to the United States Constitution. In addition, he argues that § 922(g) is unconstitutional, as a violation of the Constitution's Commerce Clause. Both of these arguments have already been presented to the Court and resolved. The Court found that § 922(g)(1) is not unconstitutional. Furthermore, the Court denied Mr. Underwood's argument that § 922(g)(1) is an unconstitutional violation of the Commerce Clause, as the argument is foreclosed by binding precedent. *See United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001). Thus, the Motions to dismiss based upon the constitutionality of § 922(g)(1) are denied.

Next, it appears that Mr. Underwood moves for dismissal of the Indictment based upon an argument that the government's evidence is insufficient. Such a motion is premature. A motion to dismiss is "'not a permissible vehicle for addressing the sufficiency of the

---

[9] Mr. Underwood raises arguments to dismiss the Indictment in several Motions. The ones currently being addressed appear in Document Nos. 95, 106, 116, and 118. In Document 118, Mr. Underwood argues for dismissal of the Indictment based upon the fact that it was the Commonwealth of Pennsylvania that initially charged him with a crime, and therefore the federal government cannot charge him with a crime. This argument is without merit.

government's evidence.'" *United States v. Gillette*, 738 F.3d. 63, 74 (3d Cir. 2013) (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012)). Such challenges are reserved for trial. *Gillette*, 738 F.3d at 74. In a criminal case the "government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29," after the government has presented its evidence. *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000) (emphasis added). Accordingly, the Motion to Dismiss for Insufficiency of the Evidence is presently denied.

### III.    Government Motions[10]

#### A. Evidence to Establish that Defendant had Prior Qualifying Convictions

In order to establish that Mr. Underwood is guilty of the charged offense, the government must prove in part, that Mr. Underwood has been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year, and that, at the time of the charged offense Mr. Underwood knew of the prior qualifying conviction(s). As of now, there has been no stipulation as to these elements. The Court notes that communication between the government and Mr. Underwood has been difficult. In the absence of a stipulation, the government moves the Court for an Order permitting the introduction of Mr. Underwood's prior convictions, to be presented in the form of certified records to establish the basic facts supporting that he was convicted of qualifying crimes and that he knew that he had such convictions.

The government's argument for admission of the certified records of Mr. Underwood's prior convictions is compelling. However, the Court will defer issuing a ruling until Mr. Underwood has an opportunity to respond at the Final Pretrial Conference. In addition, at

---

[10] The government's motions are presented in its' Pretrial Brief. ECF No. 103.

that time, he may also discuss with the government whether he is willing to enter into any stipulation.[11]

### B. Expert Testimony

Along the same lines, there has been no stipulation regarding the qualifications of the two expected expert witnesses and their testimony. The government plans to introduce the testimony of Scientist Anita Lorenz, an expert in firearm examination, and the testimony of Special Agent Robert Manns, an expert in interstate nexus of firearms and ammunition. Again, the government's argument is sound, but the Court will defer ruling pending Mr. Underwood's response at the Final Pretrial Conference.

### C. Precluding Defendant from Referring to Certain Matters

The government moves to preclude Mr. Underwood from referring to the potential penalties he would face if convicted and to preclude him from relitigating his suppression issue. These motions are granted. Mr. Underwood is prohibited from referring, directly or indirectly, to the potential penalties, the statutory maximum, or the potential guideline sentencing penalties, in the presence of the jury.

The government's motion seeking to preclude Mr. Underwood from relitigating suppression issues is premature. There is no indication that Mr. Underwood will attempt to relitigate the suppression motions that this Court has already ruled upon. Should this become an issue at trial, the government may request a sidebar for a ruling.

---

[11] The government also addresses potential evidence to be introduced to establish that Mr. Underwood is the same person as the person convicted of the prior convictions. It does not appear that there is an evidentiary issue or dispute about such evidence at this time.

### D. Motion to Limit Cross-examination of Law Enforcement Officer

The government moves to limit cross-examination of one of its' law enforcement officers. Specifically, this witness at issue was reprimanded in 2017, "as a result of a work situation whereby he did not document work hours correctly on his timesheet and was required to take annual leave for the corresponding time." Gov. Trial Br. 13. The Court defers ruling on this Motion until argument at the Final Pretrial Conference and/or when the issue becomes ripe at trial.

### E. Motion to Permit Shot-Spotter Evidence

The government seeks to introduce evidence related to the Shot-spotter report as evidence explaining why the police officers returned to the Sunoco a second time. The government's Motion is tentatively granted, subject to any objections by Mr. Underwood.

### F. Permission to Discuss Missing RTCC Video Footage

The government states that it has no intention of introducing evidence of the missing RTCC video footage. The government, however, moves for a ruling to permit it to discuss the missing footage and related evidence, if Mr. Underwood should "open the door" to permit such evidence. The Court tentatively grants the government's request, subject to developments during trial and any further motion concerning the same.

### G. Introduction of Mr. Underwood's Other Acts Evidence

Finally, the government moves for permission to introduce evidence that Mr. Underwood fired a weapon and his statements after he was detained. Such evidence constitutes intrinsic evidence that the government may properly introduce during trial.

## IV. Conclusion

The above pretrial rulings are hereby confirmed for the upcoming jury trial in this case.

The parties may address any open and deferred motions at the Final Pretrial Conference.

Date: <u>May 27, 2025</u>          <u>s/*Marilyn J. Horan*</u>
                                    Marilyn J. Horan
                                    United States District Court Judge

Gerald Underwood, pro se
Butler County Prison
202 S. Washington Street
BUTLER, PA  16001-5721